**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| CHARLOTTE PINCKNEY and KYLE PINCKNEY, | : : : | Case No. 16-5350 |
| Plaintiffs, | : : | |
| v. | : : | |
| THE PEP BOYS MANNY MOE & JACK O/D/B/A PEP BOYS, | : : : | **FILED VIA ECF** |
| Defendant. | : : | |

## AMENDED PRETRIAL MEMORANDUM OF DEFENDANT
## THE PEP BOYS MANNY MOE & JACK

Defendant The Pep Boys Manny Moe & Jack ("Pep Boys")[1] respectfully submits this Amended Pretrial Memorandum pursuant to Local Rule 16.1(c) and the Court's Order dated November 30, 2018 (ECF 56).

### I.  NATURE OF ACTION AND BASIS OF JURISDICTION INVOKED

Plaintiffs Kyle and Charlotte Pinckney claim that Pep Boys discriminated against them because of their race when a Service Manager allegedly refused them service in violation of 42 U.S.C. § 1981.  This Court has original jurisdiction over Plaintiffs' § 1981 claim.[2]

### II.  BRIEF STATEMENT OF FACTS

Pep Boys is an automotive aftermarket retail and service provider.  Pep Boys operates over 1,000 stores nationwide, including a store at 6240 Rivers Avenue, North Charleston, South

---

[1] Plaintiffs incorrectly identify The Pep Boys Manny Moe & Jack O/D/B/A Pep Boys as the Defendant in this action.

[2] The Court granted Pep Boys' Motion for Summary Judgment with respect to Plaintiffs' claims under 42 U.S.C. § 1982 and the Pennsylvania Human Relations Act ("PHRA"), as well as Plaintiffs' request for punitive damages.  (ECF 54, 55.)  Accordingly, Plaintiffs' only remaining claim is their § 1981 claim.

Carolina 29406 ("the North Charleston Pep Boys Store").

On the afternoon of June 9, 2016, Mr. Pinckney brought his Dodge Charger to the North Charleston Pep Boys store to repair a punctured tire.  Mr. Pinckney told the Service Manager, Jason Morton, he needed a plug for the front right side tire because he ran over a nail.  Mr. Pinckney pulled the car into the service bay and left the store to visit his wife at work.

 Mr. Pinckney returned to Pep Boys with Mrs. Pinckney later that evening.  Mr. Morton instructed the service technician, Scott Wurscher, to examine the Pinckney's car tire.  The Pinckneys observed their car on the lift in Service Bay One.  Mr. Wurscher examined the car and saw that the front driver's side tire was flat and severely punctured, and that both front tires were low on tread.  Mr. Wurscher told Mr. Morton the tires should be replaced, and Mr. Morton instructed Mr. Wurscher to fill the punctured tire with air.  Mr. Wurscher then plugged the punctured tire, filled the tires with air, lowered the car off the lift, and drove it out of the service bay.  Had Mr. Wurscher not plugged the tire, the tire would have remained flat, no matter how much air he pumped into it.

Inside the store, Mr. Morton told the Pinckneys their car needed new tires.  The Pinckneys allege that when Mrs. Pinckney responded they weren't there for new tires, Mr. Morton allegedly replied, "I don't need any fucking attitude."  Mr. and Mrs. Pinckney claim that Mr. Morton then said, "I'm not doing shit for you [n-words]," before telling Mr. Wurscher to "drop [the car] and get [that] shit out of here."  Mr. Morton never told Mr. and Mrs. Pinckney they could not get a plug for their tire or that their car had not been or would not be serviced.  Mr. Pinckney was able to safely drive the car home, and he does not remember the next time he had to fill the front driver's side tire with air.

Later on June 9, 2016, Mrs. Pinckney called the 1-800-Pep-Boys hotline number to

complain about Mr. Morton.  Mrs. Pinckney's complaint was escalated to Area Director Shane Helton.  During the next week, Mrs. Pinckney and Mr. Helton exchanged voicemails, but they were not able to personally speak to each other to discuss Mrs. Pinckney's complaint.  According to Mrs. Pinckney, she and Mr. Helton last exchanged voicemails on June 15, 2016.  After June 15, 2016, Mrs. Pinckney did not call Mr. Helton, the North Charleston Pep Boys store, the Pep Boys complaint hotline, or anyone else at Pep Boys regarding her complaint about Mr. Morton. Pep Boys closed Mrs. Pinckney's complaint on June 18, 2016.  Mr. and Mrs. Pinckney both believe that the only employee at Pep Boys who made them feel they were being treated differently because of their race was Jason Morton.

Approximately one week after the June 9, 2016 visit to Pep Boys, Mrs. Pinckney told her co-worker, Donna Kaestner, that Pep Boys repaired the punctured tire.  On July 24, 2016—45 days after their June 9, 2016 visit to Pep Boys—Plaintiffs replaced their car's front tires by purchasing two used tires from Champion Tires & Breaks in North Charleston, South Carolina.

## III.    MONETARY DAMAGES CLAIMED

Pep Boys is not seeking monetary damages from Plaintiffs at this time, but will seek costs, fees, and all other available relief if successful at trial.

## IV.    PEP BOYS' TRIAL WITNESSES FOR ITS CASE-IN-CHIEF

1.    **Fact Witnesses**

a)    Michael McSorley
      Regional Vice President - Service
      Pep Boys
      c/o Littler Mendelson, P.C.
      1601 Cherry Street, Suite 1400
      Philadelphia, PA  19102

Mr. McSorley is expected to testify about Pep Boys' relevant policies and procedures.

      b)      Jeff Hunter
                Former Store Manager
                Pep Boys
                c/o Littler Mendelson, P.C.
                1601 Cherry Street, Suite 1400
                Philadelphia, PA  19102

Mr. Hunter is expected to testify about Pep Boys' relevant policies and procedures and, if necessary based on the outcome of Pep Boys's Motion *in Limine* seeking to exclude any evidence relevant only to punitive damages, he is also expected to testify about the response to Mrs. Pinckney's complaint.

      c)      Scott Wurscher
                Mechanic
                Pep Boys
                c/o Littler Mendelson, P.C.
                1601 Cherry Street, Suite 1400
                Philadelphia, PA  19102

Mr. Wurscher is expected to testify about the service he performed on Plaintiffs' vehicle during their June 9, 2016 visit to the North Charleston Pep Boys store.

      d)      Robin Searl
                Customer Experience Supervisor
                Pep Boys
                c/o Littler Mendelson, P.C.
                1601 Cherry Street, Suite 1400
                Philadelphia, PA  19102

If necessary based on the outcome of Pep Boys Motion *in Limine* seeking to exclude any evidence relevant only to punitive damages, Ms. Searl is expected to testify about Mrs. Pinckney's complaint to the 1-800-Pep-Boys hotline on June 9, 2016.

      e)      John Carro
                Loss Protection Manager
                Pep Boys
                c/o Littler Mendelson, P.C.
                1601 Cherry Street, Suite 1400
                Philadelphia, PA  19102

Mr. Carro is expected to testify about Pep Boys' video recording systems and practices and will authenticate the video footage captured in the North Charleston Pep Boys Store on June 9, 2016.

f)      Donna Kaestner
8803 Deerwood Drive
Lot 4
North Charleston, SC 29406

Ms. Kaestner is expected to testify about the written statement she provided the Plaintiffs during this litigation and her conversation with Mrs. Pinckney approximately one week after the Plaintiffs' June 9, 2016 visit to Pep Boys wherein Mrs. Pinckney told Ms. Kaestner that Pep Boys repaired the punctured tire.

Pep Boys reserves the right to call those witnesses identified by Plaintiffs in their case-in-chief. Additionally, Pep Boys reserves the right to call additional witnesses as necessary for impeachment.

2. **Expert Witnesses**

a)      Julian Ackert
Managing Director
iDiscovery Solutions
3000 K Street NW, Suite 330
Washington, DC  20007

Mr. Ackert is expected to testify about his forensic examination of Mrs. Pinckney's mobile phone, including his finding that Mrs. Pinckney created evidence of a note on her phone describing the events that form the basis of Plaintiffs' discrimination claims seven months after the alleged incident and only a few hours after Mrs. Pinckney opened Pep Boys's discovery requests on her phone.  These findings were memorialized in a report prepared by Mr. Ackert dated May 8, 2018 and sent to Plaintiffs' counsel that same day.

## V.   PEP BOYS' EXHIBITS[3]

1.      Video Footage from North Charleston Pep Boys Store (June 9, 2016) – Service

Desk (PB-0001).

2.      Video Footage from North Charleston Pep Boys Store (June 9, 2016) – Register

Area (PB-0002).

3.      Video Footage from North Charleston Pep Boys Store (June 9, 2016) – Shop Area

(PB-0003).

---

[3] Pep Boys reserves the right to use any pleadings or depositions in this matter as exhibits and to use any exhibits identified in Plaintiff's Pretrial Memorandum.

4.      Email from Brian Eaton, Regional Loss Prevention Manager, Pep Boys, to Rachel Fendell Satinsky, Esq., dated December 23, 2016, regarding transmission of the video footage captured in the North Charleston Pep Boys Store on June 9, 2016.

5.      Undated letter from Mr. Eaton to Ms. Fendell Satinsky transmitting video footage captured in the North Charleston Pep Boys Store on June 9, 2016.

6.      Mrs. Pinckney's Complaint to the 1-800-Pep-Boys Hotline Number (June 9, 2016) (PB-0004).[4]

7.      Pep Boys' Call Center Notes (PB-0005 to PB-0006).[5]

8.      Pep Boys Associate Employment Guide (PB-0007 to PB-0025).

9.      Scott Wurscher's Time Card Detail (PB-0081).

10.     Pep Boys' Corporate Code of Ethics (PB-0084 to PB-0085).

11.     Pep Boys Service Record for Kyle Pinckney dated February 20, 2016 and March 3, 2016 (PB-0086 to PB-0088).

12.     Jason Morton Termination Information (PB-0134).

13.     Declaration of Jenny Berkley in Support of Defendant's Motion for Summary Judgment.[6]

14.     Screen Shots from Mrs. Pinckney's Mobile Phone (PINCKNEY00010 to PINCKNEY00014).

15.     Additional Screen Shots from Mrs. Pinckney's Mobile Phone (PINCKNEY 00016 to PINCKNEY00020).

16.     Julian Ackert's Expert Report with Exhibits (May 8, 2018).

---

[4] Pep Boys will only seek to introduce this exhibit if necessary based on the outcome of Pep Boys Motion *in Limine* seeking to exclude any evidence relevant only to punitive damages.
[5] *See* Footnote 4.
[6] *See* Footnote 4.

17.     Invoice from Champion Tires and Breaks (July 24, 2016) (CHAMPION TIRES & BREAKS 001 to 002).

18.     Certification of Donna Kaestner (August 19, 2017).

19.     Transcript of Deposition of Donna Kaestner (October 26, 2017).

20.     Plaintiffs' Answers to Pep Boys' First Set of Interrogatories (undated).

21.     Email from Martell Harris, Esq. to Rachel Fendell Satinsky, Esq. and Nina K. Markey, Esq. transmitting Plaintiffs' responses to Pep Boys' discovery requests (March 6, 2017).

22.     Plaintiffs' Answers to Pep Boys' Second Set of Interrogatories (September 20, 2017).

23.     Plaintiffs' Rule 26(a)(1) Supplemental Initial Disclosures (September 14, 2017).

## VI.   STIPULATIONS

The parties make the following stipulations:

1.      Plaintiffs are covered individuals by 42 U.S.C. § 1981.

**<u>Undisputed Facts</u>**

2.      Pep Boys is an automotive aftermarket retail and service provider.  Pep Boys operates over 1,000 stores nationwide, including a store at 6240 Rivers Avenue, North Charleston, South Carolina 29406.

3.      Pep Boys' Associate Employment Guide states that employees are expected to exhibit a "high standard of professional respect and courtesy" in every customer interaction.

4.      Plaintiffs Kyle and Charlotte Pinckney are African-American.

5.      On June 9, 2016 at 3:45 p.m., Mr. Pinckney brought his black 2010 Dodge Charger to the North Charleston Pep Boys store.

6.      When he arrived at the store, Mr. Pinckney walked to the service area and waited in line.

7.      Mr. Pinckney observed Jason Morton, Service Manager of the North Charleston Pep Boys store, behind the service desk.

8.      Mr. Morton asked for Mr. Pinckney's contact information and the make and model of the car.

9.      Mr. Morton asked Mr. Pinckney to pull the car up to service bay one.

10.     Mr. Pinckney came back inside the store, where Mr. Morton placed the keys in an envelope and told Mr. Pinckney he would let him know when the car was ready.

11.     Mr. Pinckney then walked to his wife's job, which was approximately two minutes away.

12.     At approximately 7:00 p.m., Mr. and Mrs. Pinckney returned to Pep Boys and entered through the front door of the service area.

13.     Mr. Morton then went to the service bay area and told the service technician, Scott Wurscher, to examine the car's tire.

14.     Mr. and Mrs. Pinckney both observed that their car was on the service lift in bay one.

15.     Mr. Wurscher lowered the Pinckneys' car off the lift and backed it out of the service bay.

16.     Inside the store, Mr. Morton told Mr. and Mrs. Pinckney their car needed new tires.

17.     Mrs. Pinckney spoke to Jeff Hunter, Store Manager, and a female employee in the retail area of the store to get a phone number for Pep Boys' hotline.

18.     Mr. and Mrs. Pinckney then got their car and went home.

19.     The Pinckneys did not replace the front tires on their car until July 24, 2016 when they purchased two used tires at Champion Tires & Breaks in North Charleston.

20.     Later on June 9, 2016, Mrs. Pinckney called the 1-800-Pep-Boys hotline number to complain about Mr. Morton.[7]

21.     Mrs. Pinckney's complaint was escalated to Area Director Shane Helton.[8]

22.     During the next week, Mrs. Pinckney and Mr. Helton exchanged voicemails, but did not connect to discuss Mrs. Pinckney's complaint.[9]

23.     According to Mrs. Pinckney, she and Mr. Helton last exchanged voicemails on June 15, 2016.[10]

24.     After June 15, 2016, Mrs. Pinckney did not call Mr. Helton, the North Charleston Pep Boys store, the Pep Boys complaint hotline, or anyone else at Pep Boys regarding her complaint about Mr. Morton.[11]

25.     Pep Boys closed Mrs. Pinckney's complaint on June 18, 2016.[12]

26.     Mr. and Mrs. Pinckney both beleve that the only employee at Pep Boys who made them feel they were being treated differently because of their race was Jason Morton.

27.     Mr. Pinckney believes he was discriminated against by Mr. Morton but he doesn't think Pep Boys set out to discriminate against anybody.

28.     Mrs. Pinckney told her co-worker, Donna Kaestner, one week after the June 9, 2016 visit to Pep Boys that Pep Boys repaired the tire.

---

[7] This fact is subject to Pep Boys's Motion *in Limine* seeking to exclude any evidence relevant only to punitive damages.
[8] *See* footnote 7.
[9] *See* footnote 7.
[10] *See* footnote 7.
[11] *See* footnote 7.
[12] *See* footnote 7.

29.     Plaintiffs never paid for any service from Pep Boys on June 9, 2016.

30.     Pep Boys does not have a transaction record from Plaintiffs' visit to Pep Boys on June 9, 2016.

31.     Jason Morton no longer works for Pep Boys.

**<u>Disputed Facts</u>**

1.      Pep Boys' Code of Conduct states that employees are prohibited from committing any acts of intimidation or from using abusive language against any other person during working hours.[13]

2.      Pep Boys maintains and enforces an Equal Opportunity Policy, which prohibits discrimination on the basis of race and other protected classes.[14]

3.      Pep Boys also maintains and enforces an anti-harassment policy, which forbids any conduct by its associates that may be or may be perceived as harassment, including verbal conduct such as derogatory or offensive remarks and slurs.[15]

4.      Employees can report instances of discrimination and harassment by contacting Pep Boys "Refuse 2 Lose Hotline," reporting such concerns to their manager, area director, or divisional Human Resources director, or calling the 24-hour Associate Services Line.[16]

5.      Once a concern has been reported, the case is turned over to the local Human Resources Manager to investigate and resolve the concern in partnership with Pep Boys' store operations management team.[17]

6.      Pep Boys encourages Area Directors and Store Managers to report all incidents of

---

[13] *See* footnote 7.
[14] *See* footnote 7.
[15] *See* footnote 7.
[16] *See* footnote 7.
[17] *See* footnote 7.

discrimination and harassment.[18]

7.      As of 2016, Pep Boys required all employees, including managers and non-management associates, to complete an e-learning course on workplace harassment, which covers discrimination.  Completion of this course is required every two years.[19]

8.      Pep Boys also required all new employees, including managers and non-management associates, to complete a "New Employee Orientation" e-learning module, which emphasizes Pep Boys' customer CARE process as well as its core values aimed at providing high quality customer service.[20]

9.      Additionally, in 2016, all of Pep Boys' Area Directors delivered an in-person customer service course to every store, company-wide, titled "CARE – Providing Amazing Customer Service." [21]

10.     Pep Boys assigns a number of additional e-learning courses on customer service to new employees depending on the level of customer interaction required of their position.[22]

11.      Specifically, customer-facing associates and managers are required to complete onboarding e-learning modules which cover topics such as demonstrating CARE customer-focused sales procedure, greeting customers and wrapping-up service, completing the Customer Service Request form, making web appointments, and customer service telephone skills.[23]

12.     Plaintiffs are married and reside in North Charleston, South Carolina.

13.     Mr. Pinckney knew the car's front passenger's side tire was leaking air because it felt low, and he had to put air in it every few days.

---

[18] *See* footnote 7.
[19] *See* footnote 7.
[20] *See* footnote 7.
[21] *See* footnote 7.
[22] *See* footnote 7.
[23] *See* footnote 7.

14.     Mr. Pinckney thought he needed a plug for the front passenger's side tire because he ran over a nail.

15.     When Mr. Pinckney came to the front of the line, he told Mr. Morton he needed a plug for the car's front right side tire.

16.     After Mr. Pinckney pulled the car into bay one, Mr. Morton came out to the bay area and said to him, "you people don't listen."

17.     When Mr. and Mrs. Pinckney returned to the store, Mr. Morton finished speaking with another customer, saw Mr. Pinckney, and stated, "oh, it's you again."

18.     Mr. Wurscher examined the car and saw that the front driver's side tire was punctured so severely that it was completely flat and air was rushing out of it as fast as you could put it in.

19.     Mr. Wurscher also noticed that both front tires were low on tread.

20.     Mr. Wurscher suggested to Mr. Morton that the front two tires be replaced.

21.     In response, Mr. Morton told Mr. Wurscher to fill the punctured tire with air.

22.     Mr. Wurscher fixed the puncture in the front driver's side tire by putting a rubber plug in the puncture, and he filled both front tires with air.

23.     After he plugged the tire, Mr. Wurscher told Mr. Morton that the tire was holding air.

24.     Had Mr. Wurscher not plugged the tire, the tire would have remained flat, no matter how much air he pumped into it.

25.     When Mrs. Pinckney told Mr. Morton they were not there for new tires, Mr. Morton replied, "I don't need any fucking attitude."

26.     Mr. Morton then said, "I'm not doing shit for you [n-words]," before telling Mr.

Wurscher to "drop [the car] and get [that] shit out of here."

27.     Mr. Morton said to Mr. Pinckney, "you got your girl in here bitching at me about tires," before repeating, "I'm not doing shit for you [n-words]."

28.     Mr. Morton never told Mr. and Mrs. Pinckney they could not get a plug for their tire or that their car had not been serviced.

29.     Mr. Pinckney safely drove the car home and does not remember the next time he had to fill the formerly punctured tire with air.

30.     Paperwork is created in the regular course of Defendant's business in conjunction with service requests and performance of service at Pep Boys.

31.     Mr. Morton lied about being threatened by the Pinckneys.

32.     Mr. Morton lied about the Pinckneys being arrested.

33.     Mr. Morton entered the information that resulted in the notes on Bates number PB-005 on or about June 18, 2016.

34.     Mr. Pinckney, Mrs. Pinckney, and Mr. Morton are the only available witnesses to Mr. Morton's alleged statements.

## VII.   ESTIMATED NUMBER OF DAYS FOR PRESENTATION OF PEP BOYS'S CASE

Pep Boys estimates that it will require two days to present its case.

## VIII.   ANTICIPATED LEGAL ISSUES

**Pep Boys identifies the following legal issues the Court will decide at trial:**

### 1.   Plaintiffs Cannot Prove Pep Boys Discriminated Against Them Because Of Their Race

Plaintiffs allege that Pep Boys discriminated against them by refusing to service their car because of their race in violation of 42 U.S.C. § 1981.  To recover for customer discrimination under § 1981, Plaintiffs must establish a *prima facie* case by demonstrating (1) they are members of a racial minority; (2) Pep Boys intended to discriminate against them on the basis of their

race; and (3) Pep Boys' racially discriminatory conduct abridged their contract or other rights enumerated by § 1981(a). *See Ackerman v. Food-4-Less*, Civ. A. No. 98-1011, 1998 WL 316084, at *2 (E.D. Pa. June 10, 1998); *Ackaa v. Tommy Hilfiger Co.*, Civ. A. No. 96–8262, 1998 WL 136522, at *3 (E.D. Pa. Mar. 24, 1998).

To successfully prove the third element, Plaintiffs "must produce evidence of something more than the same type of racially based, discriminatory conduct sufficient to support the second element . . . ." *Ackerman,* 1998 WL 316084, at *2; *Ackaa*, 1998 WL 136522, at *5. Specifically, Plaintiffs must show they were "actually prevented, and not merely deterred, from making a purchase or receiv[ing] service after attempting to do so." *Ackerman,* 1998 WL 316084, at *2; *Ackaa*, 1998 WL 136522, at *5. A customer typically can satisfy this element by offering evidence that the retailer asked the customer to leave the store to prevent the customer from making a purchase. *See Gregory v. Dillard's, Inc.*, 565 F.3d 464, 471-72 (8th Cir. 2009) (holding "discriminatory surveillance by a retailer is insufficient to establish interference"; also noting that element is satisfied where a retailer asks customer to leave to prevent customer from making a purchase). On the other hand, "mere offending conduct . . . does not demonstrate interference with a protected activity and any allegations of such activity are insufficient to state a claim under § 1981." *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 965 (8th Cir. 2011) (holding discriminatory surveillance "does not demonstrate interference with a protected activity and any allegations of such activity are insufficient to state a claim under § 1981" because such conduct does not satisfy the requirement that a defendant "block" or "thwart" the creation of a contract).

Even if Plaintiffs could establish the first two elements of a *prima facie* case, Plaintiffs' § 1981 claim fails because they cannot establish the third element: there is no evidence to suggest Pep Boys prevented them from receiving service. The evidence demonstrates the exact opposite – Plaintiffs received the service they requested. Plaintiffs brought their car to Pep Boys on June 9, 2016 to repair a punctured tire. The tire was punctured so severely that the service technician, Mr. Wurscher, observed it to be visibly flat and incapable of holding air. After receiving instruction from Mr. Morton to fill the tire with air, Mr. Wurscher plugged the puncture, put air in both front tires, and observed the punctured tire was holding air. Mr. Wurscher then lowered the vehicle off the lift and drove it out of the service bay. Mr. Wurscher testified that if he had not plugged the tire, the tire would have remained flat, no matter how much air he pumped into it. Plaintiffs then safely drove their car home, and they continued to drive the car for another 45 days until they replaced the front two tires on July 24, 2016.

Plaintiffs' evidence that Pep Boys did not service their car comprises, at most, an allegation that Mr. Morton said "I'm not doing shit for you [n-words]." Although Pep Boys denies this allegation, even if it was true, Mr. Morton's alleged statement to Plaintiffs is immaterial to whether Plaintiffs received service. Mr. Morton's statement is irrelevant because Pep Boys already delegated Mr. Wurscher the responsibility to repair the tire and Mr. Wurscher already completed the steps to do so when Mr. Morton allegedly made this comment. *See Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir. 2000) (holding that conduct of retail store's assistant manager in stating that she would not serve customer and giving customer the finger did not infringe customer's right to contract, and thus did not amount to unlawful race discrimination by retailer; although manager refused to wait on customer, sales clerk subsequently offered to assist customer in making a purchase).

14

There is no evidence from which a reasonable factfinder could infer that Plaintiffs' contract rights were abridged. Accordingly, Plaintiffs cannot establish the third element of their *prima facie* case, and they cannot prevail at trial.

**Pep Boys identifies the following special legal issues:**

1. As raised in Pep Boys' Motion *in limine*, Plaintiffs should be precluded from introducing evidence or testimony related to their dismissed claim for punitive damages—including evidence related to Mrs. Pinckney's hotline complaint and Pep Boys's financial condition or ownership. In their Complaint, Plaintiffs sought punitive damages under 42 U.S.C. § 1981. On October 20, 2017, Defendant filed a Motion for Summary Judgment, in part seeking to dismiss Plaintiffs' punitive damages claim. On October 30, 2018, the Court granted Pep Boys' Motion with respect to Plaintiffs' request for punitive damages. Accordingly, Plaintiffs cannot recover punitive damages at trial, and any testimony or evidence related only to punitive damages is irrelevant under Federal Rules of Evidence 401 and 402, would be unduly prejudicial under Federal Rule of Evidence 403, and should be excluded.

2. As raised in Pep Boys' Motion *in limine,* Plaintiffs should be precluded from introducing evidence or testimony related to their claim for economic damages. In their Complaint, Plaintiffs alleged they were entitled to compensatory and economic damages. However, Plaintiffs failed to produce any evidence of economic damages during discovery. Moreover, Plaintiffs affirmatively abandoned their pursuit of economic damages during discovery, testifying at deposition and stating in their interrogatory answers that they are not seeking lost wages and are only seeking compensatory damages for alleged emotional distress. Accordingly, any evidence or testimony related to economic damages should be excluded from trial, and with respect to damages, Plaintiffs should be limited to presenting only the evidence they have produced to date or statements to which they have previously testified regarding compensatory damages.

3. On January 23, counsel for Defendant learned that Plaintiffs intended to include a "hostile environment" jury instruction. Plaintiffs should not be allowed to include such an instruction or advance this alternate argument. To allow such a theory requires this Court to ignore the only cases within this jurisdiction that have analyzed customer discrimination claims under 42 U.S.C. § 1981 and instead adopt a novel "hostile retail environment" theory. To do so would not only be contrary to controlling precedent, but inconsistent with this Court's analysis of Plaintiffs' Section 1981 claim in its Opinion denying summary judgment in part. Relying on non-precedential cases from outside of this jurisdiction, Plaintiffs seek to hold Pep Boys liable on a theory that, regardless of whether Pep Boys serviced Plaintiffs' tire, Mr. Morton's allegedly hostile treatment of Plaintiffs during the retail encounter constitutes a violation of § 1981. Plaintiffs' theory has never been recognized within the Third Circuit and flies in the face of existing case law from this District. Accordingly, Plaintiffs' argument should be rejected.

To state a cognizable claim for discrimination under § 1981, Plaintiffs must demonstrate (1) they are members of a racial minority; (2) Pep Boys intended to discriminate against

them on the basis of their race; and (3) Pep Boys' racially discriminatory conduct abridged their contract or other rights enumerated by § 1981(a). *See Ackerman v. Food-4-Less*, Civ. A. No. 98-1011, 1998 WL 316084, at *2 (E.D. Pa. June 10, 1998); *Ackaa v. Tommy Hilfiger Co.*, Civ. A. No. 96–8262, 1998 WL 136522, at *3 (E.D. Pa. Mar. 24, 1998). As *Ackerman* and *Ackaa* recognized:

> "[i]n the context of a contract discrimination claim arising from a retail transaction, the courts have universally required that in order to successfully establish the third element of a prima facie case . . . plaintiffs must produce evidence of something more than the same type of racially based, discriminatory conduct sufficient to support the second element of a § 1981 prima facie case." *Id.* at 5. Thus, a plaintiff must show that she "was actually prevented, and not merely deterred, from making a purchase or receive service after attempting to do so."

*Ackerman*, 1998 WL 316084, at *2 (quoting *Ackaa*, 1998 WL 136522, at *5) (emphasis added).

Without citing to any precedential authority, Plaintiffs ask this court to disregard *Ackaa* (and, in effect, *Ackerman*). There is no support for Plaintiffs' position. Other customer discrimination cases within this district have relied on *Ackaa* and *Ackerman* and have imposed the same requirement that a plaintiff demonstrate he or she was denied rights protected under § 1981. For example, in *Singh v. Wal-Mart Stores*, plaintiff brought a § 1981 claim arising from defendant's refusal to give plaintiff a refund for a VCR he purchased. Civ. A. No. 98-1613, 1999 WL 374184, at *1 (E.D. Pa. June 10, 1999), *aff'd*, 225 F.3d 650 (3d Cir. 2000). The court held: "To establish a prima facie § 1981 case the plaintiff must show that he is a member of a protected class; that he attempted to make, enforce or secure the performance of a contract; that he was denied the right to do so; and, that the opportunity to make, enforce or secure the performance of a contract for like goods or services remained available to similarly situated persons outside the protected class.") *Id.* at *6 (emphasis added).

Similarly, in *Bailey v. Harleysville Nat. Bank & Tr. Co.*, plaintiff alleged defendant violated § 1981 when it refused to cash his check. Civ. A. No. 04-1541, 2005 WL 2012024, at *1 (E.D. Pa. Aug. 22, 2005), *aff'd sub nom. Bailey v. Harleysville Nat'l Bank & Tr.*, 188 F. App'x 66 (3d Cir. 2006). Although the court never reached the issue of whether the defendant's refusal to cash plaintiff's check satisfied the "abridgement of contract rights" *prima facie* element, the court relied exclusively on *Ackaa* and *Ackerman* in its analysis of plaintiff's § 1981 claim. *Id.* at **5-6.

As such, Plaintiffs' suggestion that the court's existing analytical framework of § 1981 claims, as articulated in *Ackaa* and *Ackerman*, does not apply to their claims here is completely unfounded. The law is clear: in the Eastern District of Pennsylvania, a plaintiff can only successfully pursue a § 1981 claim if he establishes the defendant's discriminatory conduct abridged his contract rights. In the retail context, this means

being prevented from making a purchase or receiving service. It therefore follows that Plaintiffs' "hostile retail environment" theory should be rejected, as it permits a plaintiff to succeed on a § 1981 claim even if he received the services he sought from defendant, so long as those services were provided in a "markedly hostile" and "objectively unreasonable" manner. This is simply not the law as recognized in this District or the Third Circuit and Plaintiffs cannot be allowed to proceed with a "hostile environment" jury instruction. Should the Court allow Plaintiffs to proceed with such a claim, Defendant respectfully requests leave of the Court to allow further briefing on this issue.

Respectfully submitted,

/s/ *Richard R. Harris*
Richard R. Harris (PA No. 84897)
Nina K. Markey (PA. No. 201801)
Marc D. Esterow (PA No. 323020)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267-402-3000
267-402-3131 (fax)
rharris@littler.com
nmarkey@littler.com
mesterow@littler.com

Dated: January 24, 2019

*Attorneys for Defendant*
*The Pep Boys Manny Moe & Jack*

## CERTIFICATE OF SERVICE

I, Richard R. Harris, hereby certify that a true and correct copy of the foregoing Defendant's Pretrial Memorandum, has been filed electronically with the Clerk of the Court using the Court's CM/ECF filing system.   Notification of such filing will be sent to the following:

Martell Harris, Esq.
The Trial Law Firm, LLC
BNY Mellon Center
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
412-588-0030
MH@TLawF.com

*Attorneys for Plaintiffs*
*Charlotte Pinckney and Kyle Pinckney*

                                                        */s/ Richard R. Harris*
                                                        Richard R. Harris

Dated: January 24, 2019